# EXHIBIT 4

1         UNITED STATES DISTRICT COURT

2         EASTERN DISTRICT OF CALIFORNIA

3         Case No. 1:21-cv-01784-JLT-SAB

4    _____

5    JANICE SCHMIDT and JUDY A. VANN-EUBANKS,    )

6    on behalf of themselves and all others      )

7    similarly situated,                         )

8                            Plaintiffs,         )

9         vs.                                    )

10   STANDARD INSURANCE COMPANY,                 )

11   PROTECTIVE LIFE INSURANCE COMPANY, and      )

12   DOES 1 TO 50, inclusive,                    )

13                            Defendants.        )

14   _____ )

15

16

17          RULE 30(b)(6) DEPOSITION OF

18        PROTECTIVE LIFE INSURANCE COMPANY

19       BY THEIR DESIGNEE, SCOTT CREUTZMANN

20        TAKEN REMOTELY BY VIDEOCONFERENCE

21                  June 20, 2023

22

23

24

25   Reported by:  Mary Ann Payonk, CSR No. 13431

```
 1  designate a third party to receive notice of a pending
 2  lapse as the third-party notices.
 3          Can we have that understanding for the purpose
 4  of your deposition?
 5  A.      Yes.
 6  Q.      And you're aware that the effective date of
 7  the statutes is January 1, 2013.  Correct?
 8  A.      I am.
 9  Q.      I want to confirm some facts about
10  Protective's practices with regard to the third-party
11  notices before you.
12          Prior to 2016, Protective only provided the
13  third-party notices under the statutes on new policies
14  it issued in California after January 1, 2013.
15          Is that right?
16          ATTORNEY HOLT:  Object to the form.
17  A.      Partially.  The only difference I would say is
18  I would say on or after because I think it could be
19  January 1, 2013 also.
20  BY ATTORNEY BJORK:
21  Q.      Okay.  Well, let me rephrase it.  I just want
22  to make sure I'm clear.
23          So prior to 2016, Protective only provided the
24  third-party notices under the statutes on new policies
25  Protective issued in California on or after January 1,
```

1  2013.
2          Is that correct?
3  A.      That is correct.
4  Q.      And this was because Protective had a
5  corporate practice that the statutes didn't apply to
6  policies issued prior to the statutes' effective date.
7          Is that correct?
8          ATTORNEY HOLT:  Object to the form.
9          THE WITNESS:  Can you ask me that one more
10 time?  Sorry.
11         ATTORNEY BJORK:  Can we read back the
12 question, please?
13     (The reporter read from the record.)
14         ATTORNEY HOLT:  Same objection.
15 A.      Well, we applied the statutes prospectively,
16 if that helps answer the question.
17 BY ATTORNEY BJORK:
18 Q.      It was Protective's corporate practice to
19 apply the third-party notices prospectively only to new
20 policies issued on or after January 1, 2013.
21         Is that right?
22 A.      Well, the challenge I'm having is the term
23 "corporate practice."  So when the statutes -- when we
24 became aware of the statutes, we took efforts to begin
25 complying with the statutes, which included beginning

Case 1:21-cv-01784-JLT-CDB   Document 63-6   Filed 08/14/23   Page 5 of 14

1  efforts to actually provide those third-party
2  notifications, not just with the application packet for
3  policies issued on or after 2013, but we also began
4  efforts for the annual notices.
5            So that's why I'm reacting to the words
6  "corporate practice."  That is -- I wouldn't say that
7  was a corporate practice.
8  Q.       But it was a corporate practice with regard to
9  policies issued before January 1, 2013 that continued in
10 force after January 1, 2013, right?
11           ATTORNEY HOLT:  Object to the form.
12 A.       We did not apply the statutes to policies
13 issued prior to the effective date of the statutes.
14 BY ATTORNEY BJORK:
15 Q.       Even if those policies continued in force
16 after the effective date of the statutes.  Correct?
17 A.       That is correct.
18 Q.       And that was a company policy that applied
19 across all life insurance policies that Protective
20 issued in California, right?
21           ATTORNEY HOLT:  Object to the form.
22 A.       Well, I would not describe it as a company
23 policy.  It was how we applied and interpreted the
24 statutes.
25 BY ATTORNEY BJORK:

1  Q.          And that application applied across all life
2  insurance policies that Protective issued in California.
3  Correct?
4              ATTORNEY HOLT:  Object to the form.
5  A.          Well, we applied the statutes prospectively.
6  We did not apply them to policies that were in force.
7  BY ATTORNEY BJORK:
8  Q.          That, I understand.  I guess I just want to
9  confirm that Protective's practice of issuing the
10 third-party notices only on policies that were issued
11 after the effective date of the statutes applied to all
12 life insurance products that Protective sold.
13             ATTORNEY HOLT:  Object to the form.
14 A.          Right.  So we applied the statutes to the --
15 to the -- to life insurance in force as of the effective
16 date of the statute.  I mean, I'm sorry, to -- let me
17 say that again.
18             We applied the statutes, and including the
19 third-party notifications, to policies issued on or
20 after the effective date of the statute, which was
21 January 1, 2013.
22 BY ATTORNEY BJORK:
23 Q.          And not policies that were issued before the
24 effective date that continued after the effective date.
25 Correct?

1  A.          That is correct, yes.

2  Q.          Am I right that Protective has, over the
3  course of the time period at issue, acquired other books
4  of business from other life insurers?

5  A.          Yes.

6  Q.          And is the procedure as to the third-party
7  notices that you just testified to the same for policies
8  issued by companies that Protective acquired as it is
9  for policies issued by Protective?

10             ATTORNEY HOLT:  Object to the form.

11 A.          My answer is going to be it depends, because
12 there's a lot of variables in that question.

13 BY ATTORNEY BJORK:

14 Q.          Okay.  Will you please describe then what the
15 answer depends on.

16 A.          Sure.  It depends on the date of the
17 acquisition, because if we -- if there was a book of
18 business acquired sometime in that window that we're
19 talking about, January 1, 2012 to today, it depends on
20 where you are in the timeline of when the statutes were
21 applicable and who had the responsibility, because who
22 owned the company?  Who owned the book of business?
23 Right?  So that's one factor.

24             The other factor is ownership terms and
25 conditions of any agreements between the parties and

```
 1   A.      Carol Majewski, yes.  She is retired.
 2   Q.      Okay.  And did Miss Majewski have any
 3   involvement in Protective's compliance with the
 4   statutes?
 5   A.      I'm not aware that she did.  I have not seen
 6   any evidence to suggest that she did, but I don't know.
 7   Q.      Who at Protective made the, I guess, the final
 8   call on whether to provide the third-party notices on
 9   policies issued before January 1, 2013?
10   A.      I couldn't tell you who made the final call,
11   but I -- but the folks that were involved would have
12   been the ones that you mentioned that I indicated were
13   involved in the implementation of the statutes.
14   Q.      With regard to third-party notices for
15   policies issued on or after January 1, 2013, will you
16   please describe Protective's practices with respect to
17   that category of policies.
18   A.      Sure.  For policies issued on or after
19   January 1, 2013, the third-party notices opportunity was
20   included with the application packet provided to policy
21   owners.
22   Q.      And was a third-party notice provided annually
23   each year thereafter while such policies were in force?
24   A.      I don't know that it was applied each year,
25   but I know that in 2016 there were efforts to address to
```

1   make sure that those annual notices were being provided
2   pursuant to the statutes.
3   Q.          But prior to 2016 for policies that were
4   issued in California after the effective date, those
5   policies would not have received the third-party notice
6   on an annual basis.
7               Is that correct?
8   A.          Yeah.  As I stated earlier, we began efforts
9   to have that implemented, and I don't -- I can't tell
10  you why, but something occurred that didn't allow them
11  to be issued annually until 2016.
12  Q.          And Protective modified its practices as to
13  the third-party notices with regard to policies issued
14  before the effective date at some point in 2016.
15              Is that right?
16  A.          I believe so, yes.
17  Q.          And what was the nature of that modification
18  of practices?
19  A.          I don't know why that happened.  My
20  understanding was it was a short time frame where that
21  was occurring, because the statutes at that time were
22  not believed to be applicable to policies issued prior
23  to 2013.  So it simply could have been an internal
24  error.  I don't know why that was -- why that occurred.
25  Q.          When you say "internal error," what do you

```
 1   mean by that?
 2   A.         As you mentioned, there was a short time frame
 3   where in 2016 to -- in the efforts to make sure the
 4   annual notices were being provided, in the
 5   implementation, somehow that was -- that was made
 6   applicable to policies that were in force as of
 7   January 1, 2013.
 8              Once that was realized, that was corrected and
 9   the -- then the annual notices were only being provided
10   thereafter to policies issued on or after the effective
11   date of the statute.  So there was a short window there.
12   Q.         So pre-2013-issued policies received -- some
13   of them received a third-party notice in 2016 by
14   mistake.
15              Is that correct?
16   A.         It was not -- it was not our intent to do
17   that.  So I couldn't tell you if they actually went out
18   or not.  I don't know.  But there's certainly a
19   possibility that some would have received it, and that
20   was not our intent.
21   Q.         At the time that the statutes went into
22   effect, Protective was aware that they had an annual
23   third-party notice requirement, right?
24              ATTORNEY HOLT:  Object to the form.
25   A.         When you say -- well, can you read back the
```

1  question, please, to make sure I heard it right?
2  BY ATTORNEY BJORK:
3  Q.        Sure.   At the time the statutes went into
4  effect, Protective was aware that they had an annual
5  third-party notice requirement.   Correct?
6           ATTORNEY HOLT:   Same objection.
7  A.        Okay, so that was my -- that's my -- so when
8  you say "they had," you mean they, being the statutes?
9  BY ATTORNEY BJORK:
10 Q.        That is correct, sir.
11 A.        That -- that's -- that was why I wanted to
12 ask.
13           ATTORNEY HOLT:   Hold on.   I still have an
14 objection even with that clarification, but go ahead and
15 answer.
16           THE WITNESS:   Okay.   All right.
17 A.        Yes, we -- the company was aware of the
18 requirements in the statute applicable to annual
19 third-party notifications.
20 BY ATTORNEY BJORK:
21 Q.        And why wasn't the company providing the
22 third-party notices on an annual basis to policies
23 issued on or after the effective date?
24 A.        We began efforts to do so, and somewhere in
25 those efforts, I don't know what happened, but it didn't

1   result in those annual notices getting provided.

2   Q.          We were talking a little bit earlier about how

3   Protective modified its practices somewhat after the

4   California Supreme Court's decision in McHugh v.

5   Protective Life.

6           Please describe for me how Protective's

7   practices changed with regard to the third-party notices

8   after the McHugh decision.

9   A.          After the McHugh decision, we began efforts to

10  provide third-party notices to policies that were issued

11  and still in -- issued prior to the effective date of

12  the statutes and still in force as of the date of the

13  implementation of those third-party notifications.

14  Q.          And did Protective, after the McHugh decision,

15  start providing those third-party notices on an annual

16  basis?

17  A.          Yes.

18  Q.          When specifically after the McHugh decision

19  did Protective begin sending the third-party notices on,

20  I guess, all in-force policies in California on an

21  annual basis?

22  A.          I think it was December of that year.

23  Q.          Has Protective reinstated policies that were

24  previously lapsed without the third-party notices as a

25  result of the McHugh decision?

1  A.            Well, I'm going to answer this in a clarified
2  way.  As a result of the statutes, the answer is no.
3  But have some ever have been reinstated for some reason?
4  There's a certain possibility that some have -- may have
5  been reinstated for another reason during that time
6  frame.  I couldn't tell you why, but policies do get
7  reinstated.
8  Q.            But Protective didn't change its practices
9  after McHugh and start going back and reinstating
10 policies that had lapsed between 2013 and the time of
11 the decision because of the new law coming out of the
12 McHugh order.
13               Is that right?
14               ATTORNEY HOLT:  Object to the form.
15 A.            That is correct.  We did not do that.
16 BY ATTORNEY BJORK:
17 Q.            And similarly, Protective hasn't gone back and
18 started paying out proceeds on policies that had
19 previously been lapsed in California without the
20 third-party notices where the insured has died as a
21 result of the McHugh decision, right?
22 A.            We have not made it a practice to go back and
23 look at all of those policies.
24 Q.            So is it fair to say that the only action
25 Protective has taken since McHugh is to begin providing

|     |                                                                 |
| --- | --------------------------------------------------------------- |
| 1   | REPORTER'S CERTIFICATE                                          |
| 2   | I, MARY ANN PAYONK, shorthand reporter and                      |
| 3   | Notary Public, CA CSR No. 13431, do hereby certify that         |
| 4   | the witness whose deposition is hereinbefore set forth          |
| 5   | was sworn by agreement of all parties, that the                 |
| 6   | proceedings were reported stenographically by me, and           |
| 7   | that this transcript is a true, correct, and full record        |
| 8   | of the testimony given.                                         |
| 9   | I further certify that I am not related to                      |
| 10  | any of the parties to this action by blood or by                |
| 11  | marriage, and that I am in no way interested in the             |
| 12  | outcome of this matter.                                         |
| 13  | IN WITNESS WHEREOF, I have hereunto set my                      |
| 14  | hand this 6th day of July, 2023.                                |
| 15  |                                                                 |
| 16  | _____                         |
| 17  | MARY ANN PAYONK, CSR #13431                                     |
| 18  |                                                                 |
| 19  |                                                                 |
| 20  |                                                                 |
| 21  |                                                                 |
| 22  |                                                                 |
| 23  |                                                                 |
| 24  |                                                                 |
| 25  |                                                                 |