# EXHIBIT 5

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA

3          Case No. 1:21-cv-01784-JLT-SAB

4    _____

5    JANICE SCHMIDT and JUDY A. VANN-EUBANKS,    )

6    on behalf of themselves and all others      )

7    similarly situated,                         )

8                          Plaintiffs,           )

9        vs.                                     )

10   STANDARD INSURANCE COMPANY,                 )

11   PROTECTIVE LIFE INSURANCE COMPANY, and      )

12   DOES 1 TO 50, inclusive,                    )

13                          Defendants.          )

14   _____    )

15

16

17          RULE 30(b)(6) DEPOSITION OF

18      PROTECTIVE LIFE INSURANCE COMPANY

19      BY THEIR DESIGNEE, MICHAEL REBHOLZ

20      TAKEN REMOTELY BY VIDEOCONFERENCE

21               June 20, 2023

22

23

24

25   Reported by:  Mary Ann Payonk, CSR No. 13431

1   be handling the others.

2   BY ATTORNEY BJORK:

3   Q.          So if we could turn back to Tab 4, just the

4   statute.   Please let me know when you're there.

5   A.          Yes, I have Tab 4 up.

6   Q.          Okay.  And are you familiar with plaintiffs'

7   allegations against Protective in this litigation?

8   A.          Yes, I am generally aware of the allegations

9   of plaintiff in this matter.

10  Q.          Okay.  And you're aware that plaintiff alleges

11  Protective failed to comply with the statutes as we've

12  defined them in the notice.  Correct?

13  A.          Yes, I understand the allegation.

14  Q.          And in looking at Tab 4, I will again

15  represent to you that this is one of the statutes

16  plaintiff alleges defendant failed to comply with,

17  specifically, California Insurance Code Sections

18  10113.72.

19          Please again direct your attention to subpart

20  A.  Subpart A, just so the record is clear, reads:  An

21  individual life insurance policy shall not be issued or

22  delivered in this state until the applicant has been

23  given the right to designate at least one person in

24  addition to the applicant to receive notice of lapse or

25  termination of a policy for nonpayment of premium.

1        Is it true that Protective never issued the

2    third-party notice under this provision of the statutes

3    to Mr. Eubanks?

4            ATTORNEY HOLT:   Object to the form.

5    A.        In my review of the Eubanks file I did not see

6    a copy of a notice, a third-party notice.

7    BY ATTORNEY BJORK:

8    Q.        And if you didn't see a copy of a third-party

9    notice in the Eubanks file that you reviewed, is it

10   reasonable to conclude that a third-party notice was

11   never sent on the Eubanks policy?

12   A.        What I can say is that in reviewing of the

13   policy, which I believe to be a full record of the

14   policy at this time, I did not see a copy of a

15   third-party notice.

16   Q.        And do you have any reason to believe that

17   Protective sent a third-party notice on the Eubanks

18   policy?

19   A.        Based on my review of the policy, I did not

20   see a copy of the third-party notice.

21   Q.        And you are the witness that Protective has

22   designated to testify as to the facts on the Eubanks

23   policy today.   Correct?

24   A.        Yes, I'm here to speak to the Eubanks policy.

25   Q.        And relatedly, is it true that Protective

1   never issued the third-party notice under this provision

2   of the statutes to anyone associated with Bob Eubanks

3   Productions?

4   A.        In my review of the policy file I did not see

5   a copy of the third-party notice for the Eubanks policy

6   or for Bob Eubanks Productions.

7   Q.        And again, you believe your review of the

8   Eubanks policy file was complete.  Correct?

9   A.        Yes, I did review the policy documents in

10  total.

11  Q.        Please look at subpart B of the statute.  And

12  again, that subpart of the statute reads:  The insurer

13  shall notify the policy owner annually of the right to

14  change the written designation or designate one or more

15  persons.

16  A.        Yes, I see subsection B in the sentence that

17  is highlighted.

18  Q.        And Protective never gave Mr. Eubanks an

19  annual notification to designate a third party to

20  receive notice of termination of his policy for

21  nonpayment of premium.  Correct?

22  A.        In my review of the policy file I did not see

23  any notice to designate third party.

24  Q.        And similarly, Protective never gave anyone

25  associated with Bob Eubanks Production an annual

1   notification to designate a third party to receive

2   notice of termination of the Eubanks policy for

3   nonpayment of premium.   Correct?

4   A.        In my review of the Eubanks policy file I did

5   not find a third-party notice to Bob Eubanks Productions

6   or in the Eubanks policy file.

7             ATTORNEY BJORK:  Please turn to Tab 5 in your

8   binder, which we will mark as Exhibit 4.

9         (Plaintiff Exhibit No. 4 was marked for

10        identification.)

11            THE WITNESS:  I have opened to Tab 5.  I am

12  looking at the document, but I'm on Tab 5.

13  BY ATTORNEY BJORK:

14  Q.        Okay.  And this document is titled Defendant

15  Protective Life Insurance Company's Supplemental

16  Responses to Plaintiffs' Interrogatory Number 2 and

17  Supplemental Responses to Plaintiffs' Interrogatories

18  Numbers 3 through 6.

19            Do you see that?

20  A.        Yes, I see the bolded title of Defendant

21  Protective Life Insurance Company's Supplemental

22  Responses.

23  Q.        Okay.  And you have reviewed these responses

24  prior to today.  Correct?

25  A.        Yes, I have.  Excuse me.  I have reviewed the

 1          ATTORNEY HOLT:  Object to the form.

 2   A.          Without reviewing each individual company and

 3   policy form related to administration, I would not be

 4   able to answer completely.  There are nuances to

 5   administration based on those other factors involved.

 6   BY ATTORNEY BJORK:

 7   Q.          Do you have any reason to believe that

 8   Protective's practices with regard to issuing the

 9   third-party notices for policies it issued were

10   different than those for those it administered?

11          ATTORNEY HOLT:  Object to the form.

12   A.          I don't have, you know, direct personal

13   knowledge of decisions related to administering --

14   outside of or related to the third-party notices for any

15   other companies.

16   BY ATTORNEY BJORK:

17   Q.          Okay.  Stepping back from that topic and going

18   back to the answer that -- in the Interrogatory that you

19   just read, I just want to make sure that I have the

20   facts straight.

21          So Protective provided the third-party notices

22   one time on in-force -- certain in-force policies in

23   2016 and then didn't provide any further third-party

24   notices until the California Supreme Court's McHugh

25   decision in the fall of 2021.

1          Is that right?

2     A.          Per the Interrogatory response, Protective did

3     provide third-party notices to a set of in-force

4     policies issued prior to January 1, 2013, during the

5     course of 2016 and did not resume mailing the notices

6     until following the California Supreme Court decision in

7     McHugh v. Protective Life.

8     Q.          So for in-force policies issued in California

9     before 2013, they first received the third-party notice

10    some of the -- strike that.

11          For in-force policies issued in California

12    before 2013, some of them first received a third-party

13    notice in 2016 and then didn't get any further

14    third-party notices until the McHugh decision in 2021.

15          Do I have that right?

16    A.          Per the response, Protective did provide

17    notices to a subset of policies in 2016 and did not

18    resume sending notices to other in-force policies issued

19    prior to January 2013 until following the McHugh v.

20    Protective Life California Supreme Court decision.

21    Q.          Okay.  So they got a notice in 2016 and then

22    they didn't get any further third-party notices until

23    2021, roughly five years later.

24          Is that right?

25    A.          Per the response, they would have -- some

1    policy owners that had in-force policy as of -- issued

2    prior to January 1, 2013, would have received a notice

3    in 2016, and then Protective would not have resumed

4    mailing the notices until following the McHugh v.

5    Protective Life decision.

6    Q.         And you verified that response.  Correct?

7    A.         Yes, I have reviewed the responses.

8    Q.         And verified their accuracy, right?

9               ATTORNEY HOLT:  Object to the form.  Asked and

10   answered.

11   A.         Yes, I have reviewed and verified the

12   responses to the best of my knowledge.

13   BY ATTORNEY BJORK:

14   Q.         And was the practice that you described --

15   strike that.

16              Was the practice described in the

17   Interrogatory Answer followed by Protective for policies

18   initially issued after the statute's effective date?

19              ATTORNEY HOLT:  Object to the form.

20              THE WITNESS:  Can you repeat the question?  I

21   didn't --

22              ATTORNEY BJORK:  It wasn't a great question.

23   My apologies.

24   BY ATTORNEY BJORK:

25   Q.         How often did the policies issued by

1    ATTORNEY HOLT:  All right.  Are we taking a

2  break?

3    ATTORNEY BJORK:  Sure.  How long did you need?

4    THE VIDEOGRAPHER:  We're going off the record.

5  The time is 9:48.

6    (Recess taken.)

7    THE VIDEOGRAPHER:  We are back on the record.

8  The time is 9:58.

9  BY ATTORNEY BJORK:

10  Q.    Mr. Rebholz, when we broke, I had a pending

11  question that I don't believe we got to, so I want to go

12  back to that.

13    Why did Protective provide third-party notices

14  on certain policies issued before 2013 starting in 2016?

15    ATTORNEY HOLT:  Object to the form.

16  A.    To my knowledge, the 2016 mailing was done at

17  the time programming was being done to mail for policies

18  issued after January 1, 2013.  And based on programming,

19  it included policies that were issued prior to

20  January 1, 2013.  And those policies then received the

21  notice in 2016 as part of that programming that was

22  being done by Protective.

23  BY ATTORNEY BJORK:

24  Q.    And why did Protective not issue the

25  third-party notices on this category of policies

1  2016, say, into 2017, 2018, 2019, the policy owner would

2  not have received an annual third-party notice.

3  Correct?

4  A.          Again, I don't know the issuance date of this

5  policy number.  If the policy was issued after

6  January 1, 2013, the policy owner would have received an

7  annual right to designate following 2016.

8  Q.          Well, let's assume that it doesn't fall in

9  that category and that it's a policy that was originally

10  issued before January 1, 2013.

11              If that's true, this policy would not have

12  received an annual right to designate after 2016.

13  Correct?

14              ATTORNEY HOLT:  Object to the form.

15  A.          Per the Interrogatory response that we

16  reviewed previously, policies prior to 1/1/2013 that did

17  receive the notice in 2016 would have started receiving

18  notices following the McHugh v. Protective Life decision

19  by the California Supreme Court.

20  BY ATTORNEY BJORK:

21  Q.          But not before.  Correct?

22              ATTORNEY HOLT:  Object to the form.

23  A.          Other than the notice that would have been

24  received for certain policies in 2016, policies issued

25  prior to 1/1/2013 would not have received the notice

1 ==until following the McHugh v. Protective Life decision==

2 ==by the California Supreme Court.==

3 BY ATTORNEY BJORK:

4 Q.          And that's true despite the fact that

5 Protective says in this form notice that we'll remind

6 you annually of your right to designate under California

7 law.

8            Is that right?

9            ATTORNEY HOLT:  Object to the form.

10 A.          This notice does state that we will remind you

11 annually of this right under California law.  And some

12 policies would have received that annual right, and some

13 policies may not have received a subsequent notice

14 following 2016.

15 BY ATTORNEY BJORK:

16 Q.          Please, if you would, read the third paragraph

17 of this notice.

18 A.          If you wish to designate a third party to

19 receive copies of notices affecting insurance coverage,

20 please provide us with the information below and return

21 this form to Protective Life Insurance Company.  The

22 designation will be effective no later than 10 business

23 days from the date received by us.  The law requires

24 that the person so designate [sic] sign below and

25 indicate his or her acceptance.  If you have any

1  A.          For policies issued prior to January 1, 2013

2  that would have lapsed after 2016, some of those

3  policies would have received the third-party notice, but

4  not all.

5  BY ATTORNEY BJORK:

6  Q.          And they would have received that third-party

7  notice in 2016 but not annually thereafter.  Correct?

8  A.          The policies issued prior to 1/1/2013 would

9  have received -- some would have received a notice in

10  2016 and then would have received annual notices

11  starting in post McHugh vs. Protective Life Supreme

12  Court decision.

13  Q.          Okay.  So to summarize the contents of the

14  list in this Answer, it includes policies that

15  Protective issued in California that either never

16  received the third-party notices prior to lapse or, if

17  they were lapsed in 2016 or later, may have received a

18  third-party notice but would have received it only one

19  time on or around their anniversary dates in 2016.

20          Do I have that right?

21          ATTORNEY HOLT:  Object to the form.

22  A.          The policy list includes policies that were

23  issued and delivered in California prior to 1/1/2013

24  with a small exception of I believe it's six policies

25  that were issued post 1/1/2013 that are included on the

1   list.

2          All of the policies would have terminated

3   after 1/1/2013, and these policies would have had a

4   insured who has died per -- potentially is deceased per

5   a search of public records on that as well.

6          And the list would also -- based on the

7   response on page 8 that I read, there would be policies

8   included that provided a written cancellation request

9   that terminated the policy as well as policies that

10  terminated for nonpayment of premium.

11  Q.        Is your answer to my prior question then at

12  its core yes?

13          ATTORNEY HOLT:  Object to the form.

14  A.        My answer to the question was that the

15  parameters for the search include other policies beyond

16  the criteria that you just described.  It's not just

17  those policies that are on the policy list due to the

18  limitations in being able to identify those policies in

19  the administrative system as described in page 8 of this

20  Interrogatory response.

21  BY ATTORNEY BJORK:

22  Q.        And I understand the additional information

23  that you're sharing, and I appreciate that, but I'm

24  really just looking for confirmation of the following,

25  and that is, this policy list includes policies that

1    handled?

2    A.        Again, depending on how -- how the policy

3    language describes whether or not there is any right to

4    a refund of premium, that could determine whether or not

5    the policy is terminated and no refund is provided or if

6    a refund could be provided.

7            Or if the policy is written cancellation and

8    it's within a couple days of the anniversary date, which

9    would be the next due date, a policy would be terminated

10   as of the anniversary date.  So effectively, the premium

11   would be used up until that anniversary date to cancel

12   the policy.

13   Q.        Okay.  Those are the two scenarios.  Are there

14   any others?

15   A.        I'm sure there are a number of different

16   scenarios that would fall into that.  Those are just the

17   couple that are sort of top of mind, really, first

18   driven off of the policy language on whether or not a

19   refund of premium is a contractual provision, and then

20   also, just proximity to next due date as to when the

21   policy is effectively terminated in the system based on

22   that written request.

23   Q.        If there's a written request by a policy owner

24   to cancel a policy, there's, of course, a corresponding

25   written record of such a request.  Correct?

1    A.          If the policy owner has submitted a signed

2    written cancellation request, there would be a record of

3    that in the electronic policy file.

4    Q.          So it's possible for Protective to review its

5    underlying policy files for policies on this policy list

6    and identify a request to cancel, right?

7               ATTORNEY HOLT:  Object to the form.

8    A.          There are two different scenarios there.  When

9    you say a customer that has requested to cancel, there

10   is the written cancellation where there would be a

11   document on file.

12              There also are the situations where a policy

13   owner calls in and provides express intent to cancel the

14   policy.  In that situation, our administrative process

15   is to offer the customer two options in how to effect

16   their cancellation.

17              One is to provide a written cancellation

18   request with policy number and owner's signature.  The

19   other is to inform them of what happens if they want to

20   cancel, that they will receive notices, premium notice,

21   grace notice, reminder notice; ultimately, a lapse

22   notice.

23              They can choose to either send the written

24   cancellation or, if their intent is just to cancel the

25   policy, they could also just not pay the premium and

1                   After that was prepared and tested, there --

2       the query was run of the data warehouse.  The

3       information was, you know, extracted, and then there was

4       a subsequent validation and review of those results to

5       confirm that they met the parameters in the way that was

6       expected of that, which included consultation again with

7       other administrative system team and others to make sure

8       that what was in the query was pursuant to the

9       parameters that were originally provided.

10                  My understanding from talking with the data

11      analyst team, it was, you know, hundreds of hours of

12      collective time that was taken to effect all of that

13      work to produce the policy list.

14      Q.          Thank you for that.

15                  As part of that process, Protective undertook

16      an effort to determine whether the insureds on the

17      policies that came from the query were deceased.

18      Correct?

19      A.          Yes.  Following the original production of the

20      list of California policies that had terminated, there

21      then was the effort through our unreported death team

22      pursuant to a legal request to run the unreported death

23      process on those policies that appeared on the original

24      list to identify those where we believe we have a

25      positive match to our insured as being deceased.

1          So in that case, the team uses LexisNexis

2     Accurint as a third-party source that will go --

3     we'll -- sorry, let me back up.

4          We send LexisNexis a file, secure file, of the

5     insured's name, date of birth, you know, personal

6     information to LexisNexis.

7          They perform the search through their

8     different databases, proprietary and government

9     databases, to identify if they have anything that falls

10    under what's considered a fuzzy match, meaning that it

11    is close enough that it could be the insured but may not

12    match exactly.

13         All of those results are then returned to

14    Protective.  The team then does a search individually on

15    those possible matches to try to locate a second or

16    third piece of information that helps us to feel

17    confident that we have our insured, such as searching

18    for funeral home information, for obituary, for other

19    records that would provide for similar information so we

20    could match to say yes, we do believe that this is our

21    insured.

22         And so that process was taken up to that point

23    to say we believe that these are likely matches to the

24    policy insured, and then that is how the list ultimately

25    got to the form that was produced, which included those

1  with the date of death that we believe to have found

2  through that search.

3  Q.        And as part of the process you consulted the

4  death master file as well.

5           Is that true?

6  A.        The process that Protective uses is through

7  LexisNexis Accurint, which has been deemed to be equal

8  to or better than a search of the death master file.

9           Accurint -- LexisNexis Accurint does have

10 access to all of that same information in addition to

11 their other information.  So Protective did not directly

12 search the death master file.  We used LexisNexis and

13 Accurint to do the search that was, you know, accepted

14 per other unreported death processes that we conduct.

15 Q.        And what is Protective's, to use the words in

16 the answer, unreported death team?

17 A.        So that team is led by Chris Green, which we

18 mentioned at the beginning of testimony today, and it is

19 a combination of individuals that are based in

20 Protective as Protective employees as well as some

21 third-party employees that we have contracted with to

22 help with some basic administrative work.  So that is

23 the unreported death team.

24           They are responsible for our ongoing process

25 where we search policy records and recently terminated

```
 1   policies to see if we have any matches to reported

 2   deaths to bring into our process in order to determine

 3   if there is a claim.

 4   Q.          Is the process Protective followed to

 5   determine deaths of the insureds for this policy list

 6   the same process Protective would go through to confirm

 7   deaths of an insured to make a payment of proceeds on a

 8   policy?

 9   A.          The process overall is the same.  One

10   parameter was slightly different in this case.

11               In the normal course of searching, they

12   searched for active policies or policies terminated

13   within two years.  In this search, the parameter of only

14   looking for terminated policies within two years was not

15   part of the query that was run pursuant to this matter,

16   but that was effectively the only kind of query

17   difference in how the original list of potential

18   insureds was developed in order to -- in order to

19   provide to LexisNexis to start the unreported death

20   search process.

21   Q.          And in the Answer, Protective says, quote:

22   Protective's unreported death team then researched the

23   deaths of these policies, consistent with state law.

24               Do you see that?

25   A.          Yes, I see that.
```

1    Q.         What does Protective mean by "consistent with

2    state law" there?

3    A.         The reference here, the team does look at any

4    particular state law as it relates to any regulatory

5    settlement agreement that was agreed to that sets the

6    parameters that Protective will use to perform the

7    unreported death searches.

8              "Consistent with state law" also, you know,

9    refers to the potential for postmortem interest or other

10   components that ultimately would go through this process

11   through claim.  That is the -- my understanding of the

12   reference to "consistent with state law."

13   Q.         Are you aware of any policies on the policy

14   list described in this Answer where Protective has paid

15   out the policy proceeds?

16   A.         In looking at the policy list, I believe there

17   is a policy where the death proceeds have been paid.

18   Q.         And can you identify, or could Protective

19   identify which policy that is on the policy list?

20   A.         I believe legal counsel could potentially

21   provide that policy that would have been -- would have

22   received the death benefit.

23   Q.         And then other than that, the other policies

24   on the policy list have not been paid, policy proceeds.

25   Correct?

1   A.          Correct.  You know, keeping in mind one of the

2   columns that is on the spreadsheet refers to whether or

3   not the deaths had ever been reported, and so the vast

4   majority of the policies that are on that list have

5   never had a death reported.

6              The only reason they're in there is because we

7   did the subsequent unreported death search.  So for

8   those other policies, we were never informed of the

9   death.

10  Q.          Okay.  But based on the process that you just

11  described, you're now aware based on procedures that

12  Protective follows, at least, that the insureds on

13  policies on the policy list are deceased.  Correct?

14              ATTORNEY HOLT:  Object to the form.

15  A.          Based on the information that we have, we

16  believe that the deaths we have found are the insureds.

17  So I think that's the answer to your question.  Yeah, we

18  do believe that those are the insureds that are deceased

19  on the list.

20  BY ATTORNEY BJORK:

21  Q.          When was the list identified in the Answer

22  compiled?

23  A.          The search -- there have been certainly

24  refinements of the search.  The original search, to my

25  knowledge, was in March of 2022 and then was

1   subsequently rebuilt and refined pursuant to the

2   parameters of this matter.

3   Q.        And it's possible for Protective to update

4   this policy list to identify any additional insureds

5   that have passed away since the list was originally

6   compiled.  Correct?

7            ATTORNEY HOLT:  Object to the form.

8   A.        The process that has been established, you

9   know, could be run with different parameters and used to

10  compile any subsequent list.

11           Noting again the amount of effort that went

12  into the production of this list with hundreds of lines

13  of code, hundreds of hours of time from analysts and

14  developers to get to the list, but noting that, yes, a

15  process could be undertaken.

16  BY ATTORNEY BJORK:

17  Q.        And my understanding is that the policy list

18  is limited to policies originally issued in California.

19           Is that right?

20  A.        Yes.  The parameters for the policy list

21  included policies that were issued and delivered in

22  California.

23           ATTORNEY BJORK:  Mr. Rebholz or Mr. Holt, I'm

24  going to move to another exhibit.  I just wanted to

25  check in to see if you want a break or you want to keep

1    That would trigger the fact that the insured has died.

2            There would be a review then of -- confirming

3    the date of death.  Again, looking for an obituary, some

4    additional information to confirm, search of beneficiary

5    record on the policy.

6            And then that would, you know, begin the

7    process of sending any claim forms to beneficiaries to

8    complete and submit for payment of any benefits that are

9    eligible on the policy.

10           Is it similar -- similarly to that is under

11   the unreported death process, if we locate a death, it

12   would go through the similar process where we get the

13   secondary confirmation, go through the process of

14   beneficiary notification and sending of claim packets to

15   the beneficiaries.

16   Q.       Has Protective sent claim packets to any

17   beneficiaries on this policy list?

18   A.       I would have to confirm, but as I think we

19   spoke of earlier, I do believe that there is a policy,

20   at least one if not more, where a death benefit has been

21   paid.

22           So there would have been some level of claim

23   process that had taken place on some number of these

24   policies.

25   Q.       But you're only aware of one.  Correct?

1    A.        I'm aware of one specifically.  And others,

2    I'm not -- I'm not aware of per, you know, legal counsel

3    review.

4    Q.        And could we get that answer to that question

5    by filtering this Column M for Y?

6    A.        No, the -- the Y simply states that a claim

7    was submitted.  It is not stating that a claim was paid

8    on the policy.

9              That would be a separate query that would need

10   to go along with that to determine if the claim was

11   submitted and was the benefit, death benefit ultimately

12   paid.

13   Q.        But if Protective Life paid out a claim on

14   this policy list, it first would have had -- there would

15   be a notation for Y on this column, right?

16   A.        Yes.  The one example that I am aware of, the

17   Column M does have a Y under Claim Submitted.

18   Q.        We can take that document down.

19             Protective sells a number of different types

20   of life insurance policies, right?

21   A.        Yes, Protective sells a number of different

22   life products.

23   Q.        Okay.  Term policies, whole life policies,

24   universal policies, etc., right?

25   A.        Correct, yes.  We sell term life, whole life,

1   A.          Yes.   The Eubanks policy was a $100,000 face

2   amount.

3   Q.          And the insured on the Eubanks policy was

4   Robert Eubanks, right?

5   A.          Correct, yes.   The insured was Robert Eubanks.

6   Q.          The primary beneficiary on the Eubanks policy

7   was Mr. Eubanks' wife, Violet Eubanks.

8               Is that correct?

9   A.          Yes.   Based on the review of the policy,

10  primary beneficiary was Violet Eubanks.

11  Q.          And the contingent beneficiaries on the

12  Eubanks policy were the plaintiff in this case, Judy

13  Vann-Eubanks and Diane Walker.   Correct?

14  A.          Correct.   Based on a review of the Beneficiary

15  Change Form, the contingent beneficiaries were the

16  daughters of Mr. Eubanks.

17  Q.          And Protective acknowledges that the premiums

18  on the Eubanks policy were timely paid from May of 1999

19  when the policy was issued through at least April of

20  2014.

21              Is that right?

22  A.          Based on a review of the policy, the first

23  premium was paid by check and then the Eubanks policy

24  went on an automatic withdrawal from the bank account

25  for the remaining term of the 15-year level premium

1  through April of 2014.

2  Q.        And at no point in time did Protective provide

3  Mr. Eubanks or Bob Eubanks Productions with any

4  third-party notices as described by the statutes, right?

5          ATTORNEY HOLT:  Object to the form.

6  A.        Based on my review of the Eubanks policy file

7  I did not see a copy of a third-party notice in the

8  file.

9  BY ATTORNEY BJORK:

10  Q.        And again, you believe that your review of the

11  file was thorough and complete, right?

12  A.        I believe that the -- the best of my

13  knowledge, that the file is complete, yes.

14  Q.        And you're aware Mr. Eubanks died on August 1,

15  2014.  Correct?

16  A.        Yes.  Based on review of the policy and the

17  unreported death search that was done, I do show that he

18  passed away on August 1, 2014.

19  Q.        And Protective has not paid any proceeds on

20  the Eubanks policy to plaintiff in this case or anyone

21  else.  Correct?

22  A.        Based on a review of the policy, I do not see

23  that a notice of death or a claim was ever filed on this

24  policy up until the time litigation was filed.

25  Q.        And I'm asking a slightly different question.

1  And maybe it's subsumed in your answer, but I just want
2  to confirm.
3            Protective has not paid any proceeds on the
4  Eubanks policy to plaintiff or anyone else, right?
5  A.        As part of the process related to paying out
6  death proceeds, there are steps that are taken in order
7  do that.
8            One is to be notified of the death.  Second is
9  to confirm the primary beneficiary on the policy.
10 There's communication with that beneficiary in the form
11 of a claim package that they would complete to request
12 benefits be paid.  And at that time, then a decision
13 around payment of benefits would be made.
14           So in the Eubanks case, there was no notice of
15 death.  There was no claim form or claim made, which
16 then would not allow for a decision to be made about the
17 payment of a death benefit.
18 Q.        So the short answer to my question is no, no
19 proceeds have been paid on the Eubanks policy.  Correct?
20 A.        No proceeds have been paid on the policy
21 because we were not notified and there was no claim made
22 on the policy.
23           ATTORNEY BJORK:  Okay.  Please turn to Tab 14
24 in your binder, which we'll mark as Exhibit 13.
25           (Plaintiff Exhibit No. 13 was marked for

1          Is that correct?

2          ATTORNEY HOLT:  Object to the form.

3  A.        This is the Reminder Notice.  The original

4  Premium Notice was produced 20 days prior to May 25,

5  2014 when the premium was due.  This is now a Reminder

6  Notice since the premium due date has passed.

7  BY ATTORNEY BJORK:

8  Q.        And it's a Reminder Notice on the Eubanks

9  policy, right?

10  A.        Correct.  This is a Reminder Notice on the

11  policy owned by Bob Eubanks Productions.

12  Q.        And in this notice to Bob Eubanks Productions,

13  Protective is advising the recipient that if the premium

14  payment of $5,615.10 is not made by June 25, 2014, the

15  policy would lapse.  Correct?

16  A.        Correct.  It is stating that if not received

17  by June 25, 2014, the policy would lapse subject to the

18  nonforfeiture or automatic premium loan options, if any,

19  on the policy.

20  Q.        And nowhere in this notice does Protective say

21  anything about the third-party notices under the

22  statutes.  Correct?

23          ATTORNEY HOLT:  Object to the form.

24  A.        There is no reference in this document related

25  to third-party notice.

1  Q.        Okay.  Protective's objective here was to

2  inform Mr. Eubanks or Bob Eubanks Productions that if

3  the premium wasn't paid by the due date, his policy

4  would terminate.  Correct?

5           ATTORNEY HOLT:  Object to the form.

6  Mischaracterizes the document.

7  A.        This document is a reminder of a premium due

8  to the owner, Bob Eubanks Productions, and when that

9  payment is due before coverage would be impacted.

10 BY ATTORNEY BJORK:

11 Q.        By "impacted," you mean lapsed, right?

12 A.        Correct.  That to maintain continuous

13 coverage, the payment would be -- would need to be

14 received by June 25, 2014.

15           ATTORNEY BJORK:  You can set that document

16 aside.  Let's go to Tab 19, which I'll mark as

17 Exhibit 18.

18      (Plaintiff Exhibit No. 18 was marked for

19      identification.)

20           THE WITNESS:  Yes, I have Tab 19.

21 BY ATTORNEY BJORK:

22 Q.        And this is another notice that Protective

23 sent to Bob Eubanks Productions, this one dated July 7,

24 2014.  Correct?

25 A.        Correct.  This is letting the owner of Bob

1    Eubanks Productions know that the grace period has

2    expired and that continuation of insurance coverage

3    would be subject to nonforfeiture automatic premium loan

4    options, if any.   It's stating that if the policy has

5    lapsed that the policy may be reinstated without

6    providing evidence of insurability if the payment is

7    still made by July 26, 2014, and the insured is still

8    living.

9    Q.        So Protective is advising the recipient here,

10   Bob Eubanks Production, that the policy can be

11   reinstated if the payment is made by July 26, 2014.

12             Am I understanding that right?

13   A.        Yes, that is correct.   If the premium payment

14   of $5,615.10 is received by July 26, 2014, the policy

15   will be reinstated and moved back to active status

16   without any additional evidence of insurability.   That

17   falls under the Prompt Reinstatement provision in the

18   policy form.

19   Q.        But absent that payment, the policy was lapsed

20   and would not be providing coverage as noted in the

21   letter, right?

22   A.        Yes.   If no payment is received, the policy is

23   now outside of the grace period and would be considered

24   terminated or lapsed.

25   Q.        And nowhere in this notice does Protective say

1   the time of these premiums.

2   Q.       But Protective chose not to issue the

3   third-party notices to Mr. Eubanks prior to lapsing his

4   policy. Correct?

5          ATTORNEY HOLT: Object to the form.

6   A.       Based on my review of the Eubanks policy, I do

7   not see a copy of a third-party notice.

8          ATTORNEY BJORK: You can set that document

9   aside. Please go to Tab 20, which we'll mark as

10   Exhibit 19.

11     (Plaintiff Exhibit No. 19 was marked for

12     identification.)

13          THE WITNESS: I have that Tab 20 up.

14   BY ATTORNEY BJORK:

15   Q.       And am I right, this document Bates labeled

16   PROTECTIVE 1165 through 1168, is a copy of the Premium

17   History Report for the Eubanks policy?

18   A.       Yes. This is a full premium history of the

19   policy owned by Bob Eubanks Productions insuring Robert

20   Eubanks.

21   Q.       And this document shows that Mr. Eubanks

22   satisfied his premium payments for roughly 15 years,

23   from May of '99 through April of 2014. Correct?

24          ATTORNEY HOLT: Object to the form.

25   A.       The premium history follows the 15-year level

1    premium period payments.

2    BY ATTORNEY BJORK:

3    Q.        And it shows that he made those payments,

4    right?

5    A.        The document shows that the policy was on a

6    monthly preauthorized checking withdrawal of the $111.87

7    through April 25, 2014.

8    Q.        So by my math, that is roughly $1,300 a year

9    for 15 years that Mr. Eubanks paid to Protective.

10            ATTORNEY HOLT:   Object to the form.

11   BY ATTORNEY BJORK:

12   Q.        So in total, Mr. Eubanks paid Protective

13   around $20,000 over the life of this policy.

14            Does that sound right to you?

15            ATTORNEY HOLT:   Object to the form.

16   A.        Based on the Schedule of Premiums and the

17   annual premium by 15 years, not having a calculator in

18   front of me, that does sound like the approximate amount

19   of premium paid for coverage for 15 years for $100,000

20   face amount.

21   BY ATTORNEY BJORK:

22   Q.        Does Protective have the ability to prepare

23   Premium History Reports like the Eubanks report before

24   you for other policies on the policy list?

25   A.        For policies, there can be premium history

```
 1   circumstances of the individual policy.

 2   BY ATTORNEY BJORK:

 3   Q.        And who within Protective has investigated

 4   whether claims are payable on the Eubanks policy?

 5             ATTORNEY HOLT:  Object to the form.

 6   A.        As I've stated previously in testimony, the

 7   policy -- we never received notice of death nor a filed

 8   claim relative to Mr. Eubanks -- or, excuse me, Bob

 9   Eubanks Productions-owned policy; and therefore, the --

10   there was not a claim to review.

11             Subsequent notification in 2022 was made as

12   part of litigation; and therefore, I can't speak to any

13   evaluation of the Eubanks file as it relates to this

14   litigation.

15   BY ATTORNEY BJORK:

16   Q.        Okay.  So the evaluation of the Eubanks file

17   has principally been handled by legal counsel.  Is

18   that --

19             ATTORNEY HOLT:  Object to the form.

20   Q.        -- right?

21             ATTORNEY HOLT:  Same objection.

22   A.        As I've stated, the policy -- we never

23   received notice of Mr. Eubanks' death or a filing of the

24   claim for the Eubanks Productions policy until 2022,

25   when litigation was filed.
```

```
 1                    REPORTER'S CERTIFICATE

 2           I, MARY ANN PAYONK, shorthand reporter and

 3   Notary Public, CA CSR No. 13431, do hereby certify that

 4   the witness whose deposition is hereinbefore set forth

 5   was sworn by agreement of all parties, that the

 6   proceedings were reported stenographically by me, and

 7   that this transcript is a true, correct, and full record

 8   of the testimony given.

 9           I further certify that I am not related to

10   any of the parties to this action by blood or by

11   marriage, and that I am in no way interested in the

12   outcome of this matter.

13           IN WITNESS WHEREOF, I have hereunto set my

14   hand this 6th day of July, 2023.

15

16   _____

17           MARY ANN PAYONK, CSR #13431

18

19

20

21

22

23

24

25
```