# EXHIBIT 7

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF CALIFORNIA
    _____
 3
    JANICE SCHMIDT and JUDY A.      )
 4  VANN-EUBANKS on behalf of       )
    themselves and all others       )
 5  similarly situated,             )
                                    )
 6              Plaintiffs,         )1:21-cv-01784-JLT-SAB
                                    )
 7        vs.                       )
                                    )
 8  STANDARD INSURANCE COMPANY,     )
    PROTECTIVE LIFE INSURANCE       )
 9  COMPANY, and DOES 1 to 50,      )
    inclusive,                      )
10                                  )
                Defendants.         )
11  _____
12    VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF
13                   JUDY A. VANN-EUBANKS
14  _____
15
16                      9:05 a.m.
17               WEDNESDAY, JUNE 28, 2023
18            1301 SECOND AVENUE, SUITE 2000
19                  SEATTLE, WASHINGTON
20
21
22
23
24  REPORTED BY: CARLA R. WALLAT, CRR, RPR
25           WA CCR 2578, OR CSR 16-0443, CA CSR 14423
```

1  Mrs. Vann-Eubanks?
2     A.  I knew nothing.
3     Q.  When did you come to learn about your father's
4  life insurance policy?
5     A.  When he -- after he had passed and my mom had
6  asked me to call Protective Life.
7     Q.  Okay.  Okay.  When was that when your mom
8  asked you to call?
9     A.  Right after my dad passed in 2014.
10    Q.  Okay.
11    A.  Like I think it was -- yeah.
12    Q.  Okay.  And why did she ask you to call
13 Protective Life?
14    A.  Because she wanted me to find out what the --
15 what the payout was for the -- to let them know that
16 dad had passed and what the payout would be for his --
17 his policy.
18    Q.  Okay.  And did you do that?
19    A.  Yes, I did.
20    Q.  Okay.  And tell me about that conversation or
21 conversations with Protective when you called.
22    A.  It was one conversation and when I spoke to
23 the gal, she said he -- his policy has lapsed and
24 there's nothing we can do for you.  That was the gist
25 of it.

1     Q.  Okay.  And do you know how long they stayed --
2  that Violet -- strike that.
3         How long did Violet live with your sister
4  after your dad died?
5     A.  Until her death.
6     Q.  Okay.  Death meaning Violet's death?
7     A.  Correct.
8     Q.  Okay.  And your mom passed away approximately
9  what year?
10    A.  I don't know.  Is it on here?  She passed
11 away --
12    Q.  Yeah, good point.  Sorry.
13    A.  I mean, it was like five years after dad.
14    Q.  And you're referring to Vann-Eubanks page 4?
15    A.  The -- her death certificate?
16    Q.  Yes.
17    A.  Yeah.
18    Q.  Which reflects that death certificate --
19 certificate reflects that she passed away at -- it
20 looks like in --
21    A.  '19, right?
22    Q.  Yeah, June --
23    A.  Yes, it was -- yes, June 17th, 2019.
24    Q.  Okay.  And it looks like, if I'm reading the
25 certificate correctly, that she died in the hospital,

1      A.   Probably 15 years.
2      Q.   Okay.  Do you know what were the symptoms that
3  led to his diagnosis?
4      A.   The symptoms?
5      Q.   Yes.
6      A.   Shaking hands.  That's why he went in
7  originally.
8      Q.   I missed you.
9      A.   Shaking hands.
10     Q.   Okay.
11     A.   That's why he went in originally and then they
12  diagnosed him with the Parkinson's.
13     Q.   Okay.  Tell me what you remember about the
14  progression of his disease, his Parkinson's.
15     A.   What do you mean by that?  I mean --
16     Q.   Well, was he initially able to carry on his
17  normal routines, for instance?
18     A.   Yes, for quite a -- quite a while he was able
19  to and then towards -- in 2014, 2013, you know, just
20  things just started and then at the end, he was
21  diagnosed with Lewy bodies dementia, and it was just
22  horrible.
23     Q.   So I understand you to say he declined
24  significantly in the 2013-2014 time frame?
25     A.   Parkinson's is a weird disease and so you can

1     A.   Yes.
2     Q.   Okay.  And do you see the file date at the top
3  of September 28th, 2022?
4     A.   Correct.
5     Q.   Did you review this document prior to its
6  filing?
7     A.   Yes.
8     Q.   So does that help us reorient it as to when
9  you retained Mr. Klevatt as your counsel in the case?
10    A.   The end of -- yep.
11    Q.   So it wasn't in 2023?
12    A.   Says end of 2022, yes.
13    Q.   Okay.  So at least by September 28th, 2022?
14    A.   Uh-huh.
15    Q.   Correct?
16    A.   Yes.
17    Q.   Okay.  Did you review this -- a document in
18 preparation for your deposition today?
19    A.   Yes, I did.
20    Q.   What is your understanding of the claims that
21 you're asserting in this amended complaint?
22    A.   I think -- well, the bottom line is I think
23 that we weren't supplied notification -- the
24 beneficiaries were not supplied notification in order
25 before the -- the policy termed, and we weren't given

1   an option or a choice in the matter.  It just stopped.
2   I mean, that's pretty much kind of what it says.
3        Q.  Okay.  And you are -- do you understand that
4   you are asserting a claim for breach of contract --
5   breach of the policy contract to pay the death benefit
6   on the policy?
7        A.  Yes.  Is that on page 4?
8        Q.  It is -- no, your -- your lawyer is more wordy
9   than that.  It is page 15.
10       A.  And Number -- is it 5152 or before that?
11       Q.  The -- the heading.  I just want to get your
12  understanding --
13       A.  Oh, okay.
14       Q.  -- of what you believe are your claims in this
15  case, what you understand them to be.  So do you
16  understand that you are asserting a breach of contract
17  claim?
18       A.  Yes.
19       Q.  Okay.  Do you also understand that you are
20  asserting a claim for breach of the covenant of good
21  faith and fair dealing against Protective, which is --
22  begins on page 16 of the document?
23       A.  Yes.
24       Q.  Okay.  Did you ever assert a claim for
25  benefits on the policy -- on this policy, Ms. Eubanks?

1              MR. KLEVATT:  Objection to the extent it
2    calls for a legal conclusion.
3              You can answer.
4         A.   I tried to make a claim when I emailed
5    Protective Life, but no one got back to me, so that's
6    why I sought lawyers for it, to see if they could.
7         Q.   (BY MS. WEBER)  And when you say you emailed
8    Protective Life, this was the August --
9         A.   Uh-huh.
10        Q.   -- 2022 Web inquiry email that we have already
11   talked about today?
12        A.   Correct.
13        Q.   Okay.  Do you know whether your mom ever tried
14   to make a claim on this policy during her life?
15        A.   She did not.
16        Q.   Do you know whether your sister has ever
17   submitted a claim for benefits on the policy?
18        A.   She did not.
19        Q.   Do you know why your sister has not submitted
20   a claim?
21             MR. KLEVATT:  Objection.  Calls for
22   speculation.
23              You can answer.
24        A.   I can't tell you why, no.
25        Q.   (BY MS. WEBER)  Have you ever discussed with

1         A.   No.
2              Q.   Do you understand that you in this lawsuit are
3    not -- you are not only suing in your individual
4    capacity, but you are also suing on behalf of a class?
5         A.   Correct.
6              Q.   Tell me what your understanding is regarding
7    the class allegations.
8         A.   Well, it's my understanding that everybody's
9    pretty much in the same boat that I am, and whether
10   it's -- their policies were lapsed or they didn't get
11   notifications or...
12             Q.   What is your understanding of a class action?
13        A.   It's -- well, I'm representing a class of
14   people that has -- that's -- that's what it is.
15             Q.   Okay.  How is it different than a individual
16   lawsuit?
17        A.   Because I'm representing a class of people.
18             Q.   Okay.  And you've never been a class
19   representative before?
20        A.   Absolutely, not.
21             Q.   Because you've not been involved in litigation
22   at all before?
23        A.   No.
24             Q.   What do you think your -- your
25   responsibilities are as a class representative?

1     A.  Well, I feel like everyone needs to -- I want
2  everybody to -- to -- I want to help everyone else
3  because everyone else is in the same situation as I am,
4  so I want to be able to be the spokesperson for them
5  and be able to, you know, maybe put some closure to all
6  of this.
7     Q.  Okay.  Do you understand that you are
8  representing persons who terminated their policy
9  intentionally, didn't want to pay any more premium on
10 the policy?
11         MR. KLEVATT:  Objection.  Foundation.
12 Objection.  States facts not in evidence.  Objection.
13 Calls for a legal conclusion.
14         You can answer.
15    A.  No.
16    Q.  (BY MS. WEBER)  You have no understanding one
17 way or the other?
18    A.  No, not -- no.
19    Q.  To your mind, are you representing a class of
20 beneficiaries who -- whose policies lapsed?
21    A.  Expired --
22    Q.  Lapsed accidentally?
23         MR. KLEVATT:  Objection.  Calls for a
24 legal conclusion.
25         To the extent you can answer.

1   their policies lapse as opposed to accidentally or
2   mistakenly or -- or didn't want their policies to
3   lapse?
4        A.  Right.
5             MR. KLEVATT:  Same objections.
6        A.  Correct.
7        Q.  (BY MS. WEBER)  Okay.  Did you do anything in
8   preparation for this deposition to ensure that you were
9   fairly and adequately representing the interests of the
10  class?
11            MR. KLEVATT:  Objection.  Form.
12            THE WITNESS:  Does that mean I can --
13            MR. KLEVATT:  Yes, you still have to
14  answer.
15       A.  I don't know when I'm supposed to answer or
16  not.
17       Q.  (BY MS. WEBER)  Yes, he'll tell you not to
18  answer or not.
19       A.  Okay.  Okay.  All right.  Can you ask me the
20  question again, I'm sorry?
21       Q.  Yes, ma'am.
22            Did you do anything in preparation for this
23  deposition to ensure that you were fairly and
24  adequately representing the interests of the class?
25            MR. KLEVATT:  Same objection.

1          A.  I read, that's about it.
2          Q.  (BY MS. WEBER)  Okay.
3          A.  And that was -- kind of got an understanding
4   of what everybody -- you know, it's kind of the same
5   thing as me.
6          Q.  Okay.  And when you say you read, you're
7   referring to Exhibit 6?
8          A.  I read the -- yes, this exhibit.
9          Q.  Okay.
10         A.  Yeah.
11         Q.  And you also read discovery responses by --
12         A.  Yes.
13         Q.  -- you?
14         A.  Yes.
15         Q.  Okay.  Anything else?
16         A.  No.
17         Q.  And you met with your counsel?
18         A.  Correct.
19         Q.  Okay.  What do you expect out of this lawsuit,
20  Ms. Eubanks -- Vann-Eubanks?
21         A.  I expect the -- that my -- the money that I
22  feel that we are owed from my dad paying all these
23  years for a policy and, you know, we -- we got no
24  choice in the matter to whether it was going to expire
25  or not and that's -- that's what I'm looking for.  I

1    feel like we, you know, deserve it.
2        Q.  Do you believe you have an obligation to
3    supervise your attorneys in this case as the class
4    representative?
5        A.  I feel that we talk -- I mean, I do feel like
6    we have good communication, so...
7        Q.  And how often do you communicate with your
8    counsel?
9        A.  Once a week.
10       Q.  Okay.  Is that by telephone --
11       A.  Uh-huh.
12       Q.  -- by Zoom, by email?
13       A.  Telephone.
14       Q.  Okay.  And your communications, are they
15   entirely with Mr. Klevatt?
16       A.  Correct.
17       Q.  Tell me what the damage is that you are
18   seeking in this lawsuit.
19              MR. KLEVATT:  Objection to the extent it
20   calls for a legal conclusion.
21           You can answer.
22       A.  I'm looking for the -- the amount of the
23   policy --
24       Q.  (BY MS. WEBER)  Okay.
25       A.  -- that dad had.

Page 125

1    Q.  And then the Web inquiry and nothing prompted
2    that other than this feeling?
3    A.  No.
4    Q.  You hadn't read anything?
5    A.  No.
6    Q.  You hadn't discussed --
7         MR. KLEVATT:  Objection.  Argumentative.
8    Asked and answered.
9    Q.  (BY MS. WEBER)  And your mom never made a
10   claim on the policy while she was alive?
11        MR. KLEVATT:  Objection.  Asked and
12   answered.
13        You can answer.
14   A.  No.
15   Q.  (BY MS. WEBER)  And how do you know your mom
16   never filed a claim on the policy?
17   A.  She would have told us.
18   Q.  Okay.  If you'll go back to the premium
19   notices in May, June and July on the policy, which I
20   believe are Exhibit 5.
21        Do you see those notices?
22   A.  Uh-huh.
23   Q.  Do you have any evidence that the premium was
24   paid on the policy in May 2014?
25   A.  No.

1     A.  Correct.

2     Q.  If the policy owners of one of those policies

3 called Protective and said, I don't want my policy

4 anymore, I want to cancel it, I don't like Protective,

5 I'm done with it, do you agree with me that the policy

6 owner is in a different position than your father,

7 since you claim your father wanted to keep his

8 insurance?

9        MR. KLEVATT:  Objection.  Calls for a

10 legal conclusion.  Calls for speculation.  Foundation.

11 Form.

12     Q.  (BY MS. WEBER)  You may answer.

13     A.  I think everybody's situation is a little

14 different, so I -- I can't really answer.  I don't

15 know.

16     Q.  So are you trying to represent policy owners

17 whose policies lapse for nonpremium payment where the

18 insured is still alive?

19     A.  I'm trying to represent the people that I feel

20 that they should have received notices, given an

21 opportunity.

22     Q.  Okay.  Do you have an understanding whether

23 you are representing Protective Life policyholders

24 whose insureds are still living, who haven't died?

25        MR. KLEVATT:  Objection to the extent it

1                REPORTER'S CERTIFICATE

2        I, CARLA R. WALLAT, CCR, CSR, RPR, CRR, the undersigned

3   Certified Court Reporter, authorized to administer oaths and

4   affirmations in and for the states of Washington (2578),

5   Oregon (16-0443), and California (14423) do hereby certify:

6        That the sworn testimony and/or proceedings, a

7   transcript of which is attached, was given before me at the

8   time and place stated therein; that any and/or all witness(es)

9   were duly sworn to testify to the truth; that the sworn

10  testimony and/or proceedings were by me stenographically

11  recorded and transcribed under my supervision.  That the

12  foregoing transcript contains a full, true, and accurate

13  record of all the sworn testimony and/or proceedings given and

14  occurring at the time and place stated in the transcript; that

15  a review of which was not requested; that I am in no way

16  related to any party to the matter, nor to any counsel, nor do

17  I have any financial interest in the event of the cause.

18     WITNESS MY HAND AND DIGITAL SIGNATURE this 6th day of

19  July, 2023.

20

21

22  *[signature: Carla R. Wallat]*

23              CARLA R. WALLAT, RPR, CRR

                Washington CCR #2578, Expires 1/5/2024

24              Oregon CSR #16-0443, Expires 9/30/2024

                California CSR #14423, Expires 1/31/2024

25